TUCKER, Judge.
On the 7th of October, 1779, an inquisition of escheat was found, *1083 before the high sheriff of Prince William county, in pursuance of the act of May 1779, ch. IS, concerning escheats and forfeitures from British subjects, whereby it was found “That Robert Bristow, esquire, of the kingdom of Great Britain, upon the 19th day of April, 1775, was seized in fee of 7500 acres of land in the parish of -and county aforesaid, which he hath not since conveyed away: that about thirty years ago, one R. Blackburn, who received the rents, advertised that the said Bristow would give leases to his tenants; that the said Bristow is an alien enemy, subject of his Britannic majesty; and, on the said 19th day of April was resident in the kingdom of Great Britain ; and hath not, since that time, entered into public employment of the United States of America; or joined the same, or by overtact adhered to them.”
■ This inquisition was taken in obedience to the act above mentioned, whereby it was declared that “all the property real and personal belonging, at that time, to any British subject, or which did belong to any British subject, at the time such escheat or forfeiture may have taken place, shall be deemed to be vested in the commonwealth ; the lands, slaves and other real estate by way of escheat, and the personal estate by forfeiture. That the executive so far as their information shall enable them, and the commissioners of the tax, &c. in their several counties, shall forthwith institute proper proceedings of escheat and forfeiture for all such property real and personal; and where any office shall be found for the commonwealth, and returned to the general court, it shall remain there but one month for the claim of any pretending right to the estate; and if, within that time, *'no such claim be made, or being made, it be found and discussed for the commonwealth, the title of the owner shall be barred; but may be afterwards asserted as to the money proceeding from the sale thereof, with equal force and advantage as might have been to the thing itself. ” The act then proceeds to direct the mode of selling; and adds that the certificate of the escheator to the register of the land office “shall entitle the purchaser to a grant of the lands, free and fully exonerated from all the right, title, claim and interest, legal or equitable, of any British subject thereto, and from the right, title, claim and interest of all and every person or persons whatsoever, by, or under, any deed of mortgage, the equity of redemption whereof had not been foreclosed at the time of such sale; but such mortgagees, their heirs or assigns, may nevertheless assert their claim and title to the money proceeding from such sale, with equal force and advantage as they might have done to the land itself before such sale. ”
Tn a subsequent section (sect. 3), the act provides thus, “And for preventing doubts who shall be deemed British subjects within this act, it is declared and enacted, first, that all persons subjects of his Britannic majesty, who on the 19th day of April, 1775, when hostilities commenced between the United States of America, and the other parts of the British empire, were resident or following their vocations in any part of the world, other than the said United States of America; and have not since, either entered into public employment of the United States, or joined the same, and by overt act adhered to them (and none others), shall be deemed British subjects within the intention of that act.” There is no exception in favour of infants, who may come within the above description.
This inquisition, by the exhibits agreed to be made part of this record, appears to have been returned to the general court, and filed before the subsequent term in December. At which term there was a mon-strans de droit preferred by sundry persons, as tenants for term of years, in the lands, ^subject to the payment of an annual rent, whose rights were saved to them, by the judgment of the general court, the succeeding March term 1780. But no traverse, or monstrans de droit, was filed, or preferred by, or on behalf of any other person whatsoever.
To what circumstance it is owing that the lands were not sold, does not appear. A collector of the rents appears to have been appointed; and the rents seem to have been collected by him to a considerable amount. In 1793, an act of assembly (ch. 21,) passed, directing the sale to be made: And, in April 1794, the appellee preferred his bill of injunction to stay the sale of this land, and to be quieted in the possession thereof against all persons except his tenants living thereon; and to obtain pay'ment from the treasury for the monies paid from the sales of his other property escheated and sold in the several counties in this commonwealth.
The plaintiff resrs the equity of his claim upon the circumstance of his being an infant of very tender years when the inquest was found. That his father, whose residence in England, as stated in the inquisition, is not disputed, died there in December 1776; and by his will devised the lands to the appellee; who was also his eldest son and heir at law; and that he was not named in the inquisition, although then actual owner of the lands. It is not controverted, that the appellee was born in 1773, and lived there until after the taking of the inquisition.
The preamble to the act, which is very long and special, may truly be said to furnish the key to its right interpretation. The legislature state facts, about which there can be no dispute; and principles which have received the sanction of this court in the case of Read v. Read, 5 Call, 160. I mean particularly to allude to that part of the preamble which asserts, That when the people of the United States separated themselves from the rest of the British empire, by the declaration of independence, the inhabitants of the other parts of the British empire became aliens and enemies, and as such ^'incapable of holding the property, real or personal, acquired by them within this commonwealth. To which it is added, that so much thereof as was within this commonwealth, became by the laws vested in the commonwealth. Whether this princi- *1084 pie, as it respects antecedent laws, be equally correct, as the former has been adjudged to be, I shall not undertake to decide; but as it shews the intention and mind of the legislature in the enacting clause of this act, I have thought proper to notice it. ,
What then was the intention .of the legislature in this act? Certainly, by oqe general act of confiscation and forfeiture, to bring into the coffers of the commonwealth the value of all the property, real and, personal, belonging to any British subject whatever, male or female, infant, adult, or superannuated, without exception, who might, fall within the description in the third, section. The appellee was within that description; and was bound by it. The act has been compared to a general bill of attainder against all persons coming within the description of that section; and I cannot discover apy fhing to which it could have been more aptly compared. It descends not . to name the parties; they were innumerable,, and unknown ; but it describes them; and declares that all their property, real and. personal, within this commonwealth, .belonging to them at that time; or which did belong to any of them, at the, time such escheat and forfeiture may have taken place, shall be deemed to be vested in the commonwealth.Shall be sought for, wherever,.it may be found, and sold for the use of the commonwealth. The intention of, .the act was .to confiscate the whole, by ,a legislative, and national act flagrante bello. .The right of the legislature is not, and cannot be questioned. The object of the succeeding clauses of the bill is merely to find out where lands, &c. then, or at any time before, liable to seizure and confiscation, could.be found. The act was a general procedure, against persons; the inquest of office was merely a procedure in rem; . to shew, to the agents of the commonwealth where the property. . belonging to all such persons, as were described in the .third section could be found. If the inquest found a fact untruly, viz. that the lands of. A. were the lands . of B., then B. .was allowed thirty days, if he were a citizen, to traverse the inquisition, that is, to deny the truth of it; and, if he shewed a title in, himself, the property was to be released. But a British subject was not allowed to traverse the inquisition ; that is, to deny the truth of it; but he was put to his monstrans de droit, iri order to shew that he came within the benefit of some of the exceptions in the act; as for example, that,,although a resident in foreign parts, at the time of passing the act, and all the antecedent, period between that and the 19th of Aprii, 1775, he had in fact,.by overtact, adhered to the United States, &c. Such,was the case of the late alderman Bee, as he was called, and such the , case, ,of his brother, Mr. Arthur Bee, and perhaps others,, whose cases being well known, no inquisition of escheat was ever executed upon their estates.
If the present appellee had, at that time, offered a traverse to this inquisition, it must have been rejected;-because, by his own shewing, he'was,then .a British sub-jec.t. The fact, whether he was, or was not the .person named in the inquisition, could not be,tried by a traverse, unless he could also traverse the material allegation contained in, and established by, the inquisition, viz. that the property did then belong, or did at some time since the declaration of independence, no matter when, belong to a British subject. Bor the act of October 1779, ch. 18, which passed before the inquisition was acted upon by the general court, expressly prohibits any traverse on behalf of a British subject, and also avoids all contracts for the sale of their lands, subsequent to the-former .act. And even if he had preferred a monstrans de droit, before it could have been received, he must have shewn to the court a-probable reason why he was, not within the act; and, in that case, Jie would have been - called upon to give evidence of some right in himself to .the estate; or failing to do so, the mon-strans de droit must have been quashed. Virg. Laws, October ■ 1779, ch. 18. Here *then we find, that even a monstrans de droit could not have been received on his behalf, because he certainly could not have shewn himself not to be within the act:- Which being general, infants, as well as others, not particularly excepted, .are within its operation. 4 Bac. Ab. 477; Bev. 31. . .
What then was the consequence of the inquest lying more, than thirty days in the office of the-general court without a traverse, . or monstrans de droit-, except -on behalf of the tenants? Certainly, that, the rights of all others • claiming title to the lauds were . perpetually barred. This is proved by'the express provision- in favour of mortgagees in the former .act; and of mortgagors, in the latter, as well as others having an equitable interest in.the lands. The title of the commonwealth in the lands, was consummated after the expiration of the thirty days, in all cases not excepted or specially provided for by one or the .other of those acts; and the appel-lee’s case falls within, neither of them. Consequently, the confiscation was final, and the property absolutely vested in the commonwealth long before the treaty of peace,, or the act of 1784, or the constitution of the United States, or the treaty of 1794, came into operation.
Nor is there any ground upon which a court of equity can decree a re-payment of the monies paid into the treasury, where the confiscation had not only taken place, but the subject was brought into the coffers of the commonwealth during the existence of the war between the two nations.
I am therefore of opinion, that the chancellor’s last decree should be reversed, and the first made the decree of this court upon this ground alone. But if the case of Read v. Read be resorted to, it will furnish further grounds to support this opinion.
If the epoch of -independence be resorted to as establishing the point of time when British subjects became aliens to this country, and as such incapable-of holding lands, then Robert Bristow, -the father, and Robert Bristow, the son, were both .aliens from that moment. -The - escheat- as ' to the *father may have *1085 taken place from that moment; which brings his case fully within the provisions of the act of assembly, declaring that the lands, &c. of British subjects shall be deemed to be vested in the commonwealth, from the time such escheat may have taken place. The inquisition, therefore, as to the father, had retrospect to that moment. With respect to him also, it might be regarded in another light; for he being found to have been in possession at the time when the escheat did take place, if he were dead, being an alien at the time of his death, he could have no heirs, and then according to Co. Litt. 2, the freehold was in the commonwealth without office found. So that the bare entry of the commonwealth might perhaps have been sufficient without even this office of intrusion. But on this point, I give no opinion, as unnecessary.
The appellee, according to this view of the case, being an alien at the time of his father’s death, who was himself an alien, according to the decision in Read v. Read, had no capacity to take either by descent or devise from his father, whatever might be the case as to the capacity of an alien to take by devise from any other than an alien : which is a different question, upon which it would be improper to give any opinion at present.
An alien enemy cannot make a testament of lands or goods. Wood’s Inst. 33S ; 7 Bac. A.b. 302. Like the wills of traitors, felons and outlaws, they are void against the king or superior lord; because their title is paramount to that of the devisee. So by the common law, a jointenant could not devise the lands of inheritance which he held in jointure, because immediately on his death, the law cast the whole inheritance upon the survivor: The title which the law thus gives to the survivor being paramount to the devise, which cannot take effect until the death of the devisor; and then the title under the law takes effect by priority. Robert Bristow, the father, is by this inquest found to be an alien enemy. That fact cannot now be questioned ; and is, as to this point, conclusive against his son.
*ROANE, Judge.
In the case of Read v. Read, I thought that the act of 1779 confiscated all British property in this commonwealth ; that the office was only necessary to identify the property, and not to complete the title; and that the treaty of peace did not restore the estate to the British subject, under any circumstances. Of course, the plaintiff, according to that opinion, had no claim to relief. But, under another point of view, his pretensions are unfounded. For an office has actually been taken, which is conclusive upon every principle of law, unless the exceptions urged against it were valid. But they are not: If indeed, the act had merely said that the lands of the father should be confiscated, that would not have affected those of the son, if he had anj in this country; But the act is general, and confiscates the lands of all British subjects indiscriminately; and the appellee is completely within the meaning of it. Therefore, he could neither have traversed the inquisition, nor prevailed by a monstrans de droit; for there was no provision to that effect in the act. Besides, the bar of the thirty days, which was intended to meet all objections of this kind, on account of the difficulty of knowing what transfers had been made, is conclusive : for it extinguishes the rights of every body, infants as well as others, as there is no saving in favour of any person; and it has been often held that an infant would have been barred by the act of limitations, if there had been no exception in his favour. I concur, therefore, that the decree should be reversed, and the bill dismissed.’
FLEMING, Judge.
I am very clear that the court of chancery had jurisdiction ; for the fifth section of the act of assembly appointing the auditor, gives a complete right to every claimant against the state to resort to the courts for redress. But, upon the merits, I am of opinion that the appellee has no claim to relief. For it was settled, in the case of Read v. Read, that all British subjects became alien enemies to this country, upon the declaration of independence; *and under that idea, the legislature, by the act of 1779, took measures for confiscating their property according to the forms of escheat. That proceeding was instituted in the present case, and an office actually found: which was conclusive, as the thirty days passed off, without any attempt to impeach it; and the act is express that no exception should be taken to it afterwards. The infancy of the appellee created no exemption, as the act is positive, and concludes every body. That the plaintiff was not named in the inquisition, makes no difference; for the office was only necessary to identify the property, as the right was vested in the commonwealth by the terms of the act; and an office of instruction only was necessary to finish the transaction. The confiscation, then, was completed by the office before the treaty of peace, which consequently had no operation. I am therefore for reversing the decree, and dismissing the bill.
CARRINGTON, Judge.
It is the unanimous opinion of the court, that the decree should be reversed, and the bill dismissed.